Good morning, Your Honor. Good morning. I'm Dale Fiola for the appellant, Mr. Scott, and we're really blessed to be here in San Francisco presenting, especially a case that was heard in the Central District of Los Angeles. I think that I'm going to start with the strongest claim that we've made, which was the retaliation. And initially, Judge Kronstadt determined that it was viable and denied summary judgment on October 3, 2012. And then the appellee filed a motion for reconsideration saying that the opposition that allegedly was made by Mr. Scott was not sufficient enough to constitute opposition. Well, your retaliation is fairly much tied to your rehabilitation claim, correct? Somewhat, because he was inquiring why he was not selected to the supervising industrial engineer position. And that really is where the crux of this case lies when you're talking about the retaliation. He assumes his job on April 30, 2007. He does his job rather well. I mean, he has no complaints. Then, as he gets more accustomed, this can be based upon reasonable inference, which we're entitled to draw as the plaintiff in this case, and the court has to look at reasonable inferences. And in this particular instance, his performance was satisfactory. Then he decides he can approach his supervisors and inquire why he wasn't selected for that supervising industrial engineer position. And they say, bring in your credentials, bring in your diploma, we'll take a look at it. So he does in June. He submits that. And they don't respond. Well, now, I thought your retaliation was based on the failure to accommodate. Well, that's one. That's one of the prongs. But there's actually two prongs. Well, your arguments seem to be a moving target. That's why I'm having trouble following them, because you somewhat have taken the throw everything against the wall or the kitchen sink and then figure it out. But, I mean, I understood that your argument was based, your retaliation argument was basically based on the accommodation. From the complaint, it appears that Scott alleges he was terminated because of his race, not because of any request for accommodation. I mean, I don't know. What are you – I'm having a hard time understanding what you're contending. Well, it is in my briefs, because I'm reciting from it. And when we opposed the motion for reconsideration, we spent some time going into it. And so the inference is, is after he asked why he wasn't selected, submitted the necessary documentation, did not get the response, that is when it all became the tempest in the teapot. They started reacting. And they go, and it's in a declaration submitted by the Apolis employee. Declaration of Garcia says, in or about mid-June 2007, Mr. Kelly, that was the manager, and I met with legal administrator advisers. Now, was this before or after he told Mr. Garcia and sort of went behind Mr. Garcia's back and said that he wasn't qualified for the job? That was – I mean, that didn't seem to start the relationship off too great. That came later. What I believe was why he felt he was not selected. It was more of an inquiry. And then in December, when he was confronted with his not being qualified for the second supervising industrial engineer position, that's when he decided to lay the heavy-duty remark. But before that, he was very congenial in asking. And he said at that particular point why he wasn't selected and was inquiring. Follow what they require. Bring the diploma and bring your credentials in. Then they have their meeting with Margot Padilla, who's the legal administrator for the base. And they discuss plaintiff, but they discussed his abusive behavior. Now, when you put it in the context of what he was doing, the reasonable perception of Kelly and Garcia was he's challenging it. He's a black guy. We're white. And he's challenging why he wasn't selected for the position. So they then go to Margot Padilla, and she decides that she recommends that they assign a mentor to watch his behavior. That mentor was George Austin. Now, George Austin declared that he was being asked to do that, to monitor his behavior. But his breaks, time off, things of that nature that shows that he was a plant there to dredge up any negative data. When on the timeline was Austin asked to do that? I think it came sometime in July or August. But by September, he was fully integrated in that position of mentoring. But it was definitely after your client started making inquiries about why he didn't receive it? That's right. And so when you look at the course of events there, it looks very logical that an inference could be drawn that they were feeling challenged when he was saying, you know, I'll bring my credentials in. I'll bring my diploma in to show you that I was qualified for this position. They then took it upon themselves to say that's abusive behavior, although they don't earmark it as to what was the actual abusive behavior. Your client was making these inquiries of Garcia and Kelly? Both of them. But were either of them involved in the actual hiring decision? Yes. Tom Kelly sat on the actual panel to determine who was going to be selected. And Garcia was the one selected. And he was the one selected. Okay. So that's where you take a look at this, and it looks like it really parses together rather well that they were actually trying to stop him. And then all of this negative stuff developed. They took him off over time. They made it difficult for him to perform his job. Remind me, Austin testified in his deposition that one or both of Kelly and Garcia said to him, basically, you know, give us all the bad scoop on your client. Correct. Who was the one who told him to do that? Do you remember? Garcia. It was Garcia. Garcia told him. Well, let me get it correct. Garcia told him that it's what Tom Kelly wanted him to do. I see. But he wasn't saying it was him that was digging up the bad scoop, but that's what Tom Kelly was orchestrating. I see. Counsel, I'm just curious in this case. The events here happened. They happened a while ago. Let's say we agree with you, not on the racial discrimination claim, but the other two claims. What is your client seeking at this point? Is he seeking to be reinstated? Is he seeking to have a new job? The reason I ask this is because I'm wondering if this case could be a candidate for our mediation program. You don't need to decide that today, but I'm just wondering if this is the kind of case that if you had a mediator help out to figure out what to do, if you think that would be helpful. I think initially there was a questionnaire about that when you were getting the Ninth Circuit, and I think we passed on it. I don't think he's necessarily thinking as an equitable remedy reinstatement, but I think he's thinking he's lost some compensation here. Although, from what I understand, and counsel, correct me. Well, he had a lawsuit with a previous job, right? That's correct. Somehow that worked out for him. He settled it in January of 2011. But I think at this point, and I want to make sure the record is clear, that he is making more income in his current position. So it would be really up to him to see what his damages are to prove those damages. And, of course, we don't deal with those issues in motions for summary judgment. But damages would definitely be the mainstay of what he's looking for, and reinstatement is an option that the court can look at, too. He doesn't get to say, I want to be reinstated. He can request it, but the court has the right to say, I consider there was too much friction in the workplace to justify your reinstatement. And so then you do something prospective with front pay for a certain period of time. I had one other question for you, and it has to do with the declaration of, and I might be mispronouncing the name, Dr. Guadiz? Guadiz, I think, is the correct pronunciation. And either now or in rebuttal, if you could just tell me where that was in the excerpts of record. My staff had trouble locating it. All right. It would be, let me see if I can find it quickly. And if you want to do it again while counsel is arguing to not burn your time down. That might be a better idea. Sure. Because it would give me some time to reflect. Just by the end. But Guadiz, and then he, we submitted that supplementally. The court had, we had filed our papers. The court then said I had to redraft my objection format. It wasn't correct. And in the meantime, he took the matter under submission. We submitted supplemental memorandum with that declaration attached. And so. So your client was on probation, right? And they terminated him before the completion of his probation. I don't know if we're going to fight tooth and nail over that. But there is this issue, and there is no case law in the area, that while he was litigating the TSA issue, which was settled in January of 2011, there could arguably be a statement that it was never finalized. His employment, even though it was recognized, is terminated. I don't think that's your best argument. I don't think so. So what similarly situated people do you have to make your prima facie case on race? The two individuals were Dale Dunn and Fulkerin. I think his first name is John Fulkerin. And they were disciplined, but they were not fired. Is that? But then they were not on probation, right? There really wasn't. The record does not show discipline. It just shows that they were aware of their abusive behavior, and that was it. They were not disciplined, whereas my client was ultimately terminated for that very act. And so the issue is whether or not a probationer does have rights in the context of this particular employment. And the answer should be yes, because the Master Labor Agreement permits progressive discipline for an employee who's being disciplined for less than 14 days of suspension or with a written warning. He was entitled to that, and yet they did not give him that. They used counseling, supervisory counseling memos, to discipline him, which is not accepted by the MLA. The MLA says- How much did you want to reserve, did you say? I think two minutes. Oh, okay. But did I answer your question? Well, I think that if that's your theory, then I think I understand what you're saying. Okay, well, I'll reserve the rest. Good morning, Your Honors. Good morning. U.S. Attorney Alarice Medrano for the Secretary of Defense.  Well, this started out pretty badly when you put the supervisor of a person who didn't get the job. This situation, was that the best way to start things out? Well- I mean, Mr. Garcia beat Mr. Scott out for the job, right? That's correct. He was selected for the position. Mr. Scott was selected for a subsequent position and then came under the supervision of Mr. Garcia. And therein lies the problem. Almost immediately, he became very difficult to deal with. He was an antagonistic and uncooperative employee, essentially from the start. He would take on Garcia. For example, he'd test him about what degree he had. At excerpts of record 1317, you have him asking his own supervisor, what kind of degree do you have? And then claiming that he just didn't believe him based on the look he got. He said there was another occasion where he didn't really need his supervisor's help, but he asked him to help him calculate something just to prove that he wasn't capable of doing it. He said he was teasing him. He referred to him as a social studies major. And that's throughout the record, excerpts of record 1385 through 90. He didn't like that he was given someone to mentor him. He even took on Austin at some point, who was also African American, was a longtime supervisor. Mr. Kelly, his second-level supervisor, said he very much appreciated Mr. Austin's help and believed him capable of intervening here and making things better. But again, Mr. Scott says, I shouldn't have to explain to everyone in the department. And I know things better than Austin does. Those are the excerpts 1337 and 1411. He even took issue with the union rep that was assigned to assist him in these meetings. He said the union rep wasn't helping him. That's at 1327. He was just a very difficult employee to supervise almost immediately. And the counseling memos that Mr. Fielder refers to were exactly that. Remember, he is a probationary employee. And the master labor agreement that was put in indicates, and it's at excerpt 653, one purpose of the probationary period is to allow employees a reasonable and fair opportunity to make good. Accordingly, management will evaluate the performance of probationary employees and counsel them concerning performance deficiencies, if any, during the probationary period. That's what Mr. Kelly and Mr. Garcia attempted to do for eight months. And we can see by the series of memos that were created from 1255 to 1262 in the record that they are continuously talking about the same things. They are asking him to explain what he's doing, why he needs overtime. And then he responds, you should know. This is not a workable employment relationship. Well, you know, you may well be able to persuade a jury of that, but we're not here to ultimately resolve these factual questions. I guess on the retaliation claim, which your opponent says is his strongest claim, maybe you could focus there. I mean, the remark from, or the testimony rather, from Austin seems pretty damning. The testimony from Austin, right, seems pretty damning for your client, at least at the summary judgment stage, because he says that Kelly, through Garcia, basically said, give us all the bad stuff on this guy and take notes. And that would suggest that they were maybe for the reasons you just described, the guy's difficult, let's try to get rid of him. But maybe a jury could conclude it was because Mr. Scott was complaining or suggesting that perhaps he had been discriminated against and not getting the initial supervisory position. Well, first of all, when he approached his supervisors about a GS-12 position early on, he indicated that he wanted another position like that. He was not satisfied with the GS-9 position. But a simple inquiry of your supervisors about whether there are other jobs available doesn't mean that you're complaining about discrimination. He certainly never used the term racial discrimination. So why did you initially, what was the problem with initially the court left the retaliation in play because of an understanding that you had stipulated that that one survived? And then the court, so why? There was not a stipulation that that had survived. Well, what was the, initially summary judgment was not granted on the retaliation. That's right. So there was a misunderstanding that you weren't, you know, you weren't asking for summary judgment on that or you didn't think, you thought that the retaliation survived. No, I believe he indicated that there was no argument. So I filed a motion for reconsideration and pointed out that, yes, we had indeed made that argument. We had a hearing. We had, he asked for additional briefing. And each side submitted additional briefing on the participation clause. And thereafter, the judge did rule in our favor. And I think it was always our contention that there was no retaliation here because there were. . . Well, what about the failure to accommodate? If he says, assuming he said, I got a problem walking and then there's the situation of he's having to share the scooter, you know, he's claiming he needed the scooter and that the keys were taken away. And then, so, and there's a sort of a time, things are happening in a time sequence that if you give all inferences to the appellant, that, and retaliation is the easiest one to survive summary judgment. It looks like you've got, you know, you've got events and you've got them occurring in a time span that maybe the retaliation survives. Well, I would disagree on that point, Your Honor. The retaliation claim would have been based on two alleged theoretically protected activities, or at least that's the allegation by the other side. We contend that it's not true. Either it was for the non-selection for the 2006 job that his supervisor, Mr. Garcia, received. Well, he never broached that with EEO. He never brought an EEO complaint on that. He never exhausted that claim. So the only other issue we're left with is, did he request? Well, wait, wait, just stop right there, though. So what, you're just saying because he never complained about that, somehow that can't form the basis for an opposition clause claim under retaliation theory? It could if he indicated that it was racially based or based on some disability. He doesn't need to tell the employer, though. The reason I'm making these inquiries is because I think you, you bastard, discriminated against me on the basis of race. He just needs to make inquiries, right, that would put the employer on notice that, uh-oh, this person might, you know, be thinking about pursuing a claim. Well, his inquiries, though, if you read them in the context of his declaration, he's trying to get their assistance to get another job, and he admits that. He says he didn't want to make anybody angry. He wanted to explore whether there were other jobs that were available to him. If you look at the declaration of Ms. Weiss, she explains that there was a lot of downsizing going on and certainly there were positions that were never filled. In fact, all of these people were hired in a very short sequence of time. Mr. Kelly was hired in 2006. He hired Mr. Garcia the following year and also Mr. Scott. So they were all hired within a very short period of time. They are all now gone, and their positions have stayed unfilled. Mr. Austin, in fact, has been promoted to be the head of that department. Okay, so I'm not sure why that's of any relevance, actually. I'm saying that to you because this was a cooperative effort to figure out if there were other positions available to him. It was not his indication that he felt he was being discriminated against. Okay, so I hear you, but let me just make sure I understand your argument. Are you saying that he never, when he made these inquiries at the outset, that he never suggested that, hey, I should have gotten that job because, you know, I'm qualified for it? No, he did not, other than to say to others that he believed Mr. Garcia was not qualified for it, and I think there's lots of references. And Mr. Garcia got the job that he . . . Right. And then he didn't want other jobs that they were looking for. He wanted that specific job. So why can't you make, why don't they get the reasonable inferences there? Because there was a process by which Mr. Scott was selected for that job, and Mr. Garcia was selected for the job. Mr. Scott was not able to show in any way that his qualifications were better or that there was any reason for the hiring of Garcia. So that's why you might win on the discrimination, but that still doesn't handle the retaliation. Well, let's focus on then the things that he claims were retaliatory. He never made a request for an accommodation in this case, and he admits that. If you look at his deposition, I deposed him twice, and I asked him, and he said, no, I never asked anyone for accommodations. In his declaration, if he changes that testimony, that's not enough to defeat a summary judgment motion, and he even then doesn't give us enough to conclude that he asked anyone for a reasonable accommodation. Let me ask you this, just so I understand the timeline. He mentioned his leg hurts, and he asked to use the cart. And I know there's some dispute as to how frequently he was allowed to use the cart or whether he had sole control of the cart or other people had the cart. Then Austin is assigned to kind of watch over him. Is that the correct timeline? Austin was assigned in the summer of 2007. Mr. Scott was not clear about when he made any of the requests to use the cart, but the indication is that it was throughout, that everyone in that department, the 10 to 15 individuals who worked there, all needed to use the cart. Is there some evidence in the record to suggest that his request to use the cart was before Mr. Austin was assigned to look over his shoulder? There's no specific date, but my assumption is yes. Based on the deposition testimony, it was hot, it was Barstow, California, it was 117 degrees. He mentions the heat a couple of times in his deposition and says I needed the cart, it was hot, nobody wanted to walk. And that was really the issue here. But if someone, so if you're that side, and I'm pointing for the record to Mr. Scott's side, if their theory is that my client said he had trouble with his leg, in fact they gave him special shoes to do his job, and then after he made that request there was some dispute over cart usage, and then Mr. Austin is assigned to basically look over my shoulder to try to see if they can get me fired, why isn't that enough to get to a jury? Scott is assigned to mentor him, and there's even testimony by Austin that he and Scott walked together to various places. Right, but go back to the scenario I just laid out. He complains about his leg, there's a dispute over the cart, whether he got enough usage of the cart, and then Austin is assigned to, using their version of the case, find out a reason to get him fired. If that's the timeline, then why doesn't that go to a jury? To establish retaliation, he has to show that he was engaged in some protected activity. Right, and so presumably his saying my leg hurts, I want to use the cart, wouldn't that be protected activity? That would not be protected activity unless he's indicating some good reason for requesting that kind of accommodation. He got the special shoes, correct? Everyone got special shoes. Everyone that worked there got the steel-toed shoes. It was a requirement. That's in Mr. Kelly's declaration. Mr. Scott indicated he needed a lift in his shoes, and that was done. But that's a special shoe compared to what everyone else gets. They all go to, there's explanation of this in the deposition, that they all go, that this cart or van comes every couple of weeks, everyone goes out to do that. I'm not even sure that Mr. Kelly was involved in that additional part of getting a shoe. So to Mr. Kelly's knowledge, he was getting shoes. I'm not sure that it's ever been clarified that he knew that there was some additional lift required in that shoe. I thought, if I'm remembering Austin's deposition testimony, there was at least one incident where, I don't know, Scott was running late, he was taking him a long time, and Austin said, hey, maybe I should go get him on the cart. And I think it was Garcia who said, no, you don't need to accommodate him. It was literally, that's how Austin's deposition testimony is framed. Again, why wouldn't that be a suggestion that at least someone on your client's side was aware of the fact that he needed an accommodation, and they were basically dead set on not granting it to him? Well, again, the use of the cart seemed to be an issue for everyone in the department. It was regularly, and that's in the testimony of Mr. Kelly, it was regularly an issue. Who had the cart? Keys were taken and kept by certain individuals, though others didn't. Well, they took them away from him at some point because they thought he was, I mean, the inference would be that he was sort of, he wanted his own cart. And so he took a, they took, I think it was Garcia asked for the keys and took them away because he viewed it as a cart that everyone could use. That's correct. But if, in fact, he said, I mean, I think he claims he said, I've got a problem walking. He had asked for the shoes, all of that. Now, whether that's enough to make the rehabilitation, but, you know, with the timeline, isn't it possible to say, well, he was asking for this just for himself because he needed it, because he had special problems, and so they took the keys away from him? But there's been no showing that Garcia knew he had a special problem or that he needed the cart for a particular reason other than that he just wanted a cart. He made efforts to take carts from other places as well, and other departments would come and request the keys for the carts. It was a running problem in the department. But what about that Austin made the comment, yeah, he needs the cart or something? Austin's testimony is difficult to use in this case. There was different testimony at different times during Austin's deposition. You could look at it. Austin didn't really testify specifically for anyone. Maybe he just told the truth. He's not perfect for you. He's not perfect for, you know, Mr. Scott. But maybe Austin's the one that's telling the truth. And the court does not have the benefit of the entire record of Austin's deposition testimony. Is that our problem? No, and I did not reference it because there was difficulty gaining his deposition testimony, and it was different than information that had been provided earlier. Okay. You've used your time, but if either of my colleagues have any questions. All right. Thank you for your argument. Thank you. To answer your question, Justice Owen, I was unable to locate the declaration of Gwadis. Could you post-argument submit a letter to the court once you're able to locate where it is in the record on that? It's not located in the record. Oh, it's not in the record anywhere. It's not in the record. It's in the record of the district court. No, that's fine. I mean, it's part of this court's record. It may not be in the excerpt of record that's submitted to the Court of Appeals, but it is part of the court record. Yes, it is. Okay. If you could submit a letter to the court so indicating where that is by docket number, that would be helpful. Okay. All right. Thank you. I'll do that. And then just briefly. Within a week? Yes. If you could do it within a week, that would be great. Within a week? Okay. Yes. It's not going to do us any good if you take months. That's correct. All right. Thank you. With respect to the comments of the Appalachian Council, he wanted to use the green card, which was designated for the engineering department. And when they took the keys away, when Mr. Garcia took the keys away, he then went to this Billy Cunningham, who's the installation and logistics department supervisor, and told him about his hip problem and getting around and walking. And Cunningham allowed him to use the gray card at his department. So he was trying to find – eventually the gray card went away. And so he was left to walk, and I don't know. At this particular point, it seems that there was some orchestration going on to try to scare him away, to get him to leave. And that's one of the reasons. You make it difficult for the person to do his job. You criticize his job performance. You call him abusive. And then you terminate him. And I think that's a sad commentary to Mr. Scott's employment history with this employer. So we're looking for relief, and we're willing to rest on the record as it stands. Thank you very much. All right. Thank you both for your argument. This matter will stand submitted, and this court is in recess for today. Thank you.
judges: Callahan, Watford, Owens